Gary K. Kahn (Oregon State Bar #814810)
Peggy Hennessy (Oregon Bar #872505)
Reeves, Kahn, Hennessy & Elkins
4035 S.E. 52nd Avenue
P.O. Box 86100
Portland, OR 97286-0100
Telephone:  (503) 777-5473
gkahn@rke-law.com
phennessy@rke-law.com

Jack R. Tuholske (Montana Bar # 2902)
TUHOLSKE LAW OFFICE, P.C.
1149 Harrison St.
P.O. Box 7458
Missoula, MT 59807
Telephone: (406) 396-6415
jtuholske@gmail.com
*(pro hac vice to be submitted)*

Timothy Bechtold (Montana Bar #4376)
Bechtold Law Firm, PLLC
317 E. Spruce Street
PO Box 7051
Missoula MT 59807
Telephone (406) 721-1435
tim@bechtoldlaw.net
*(pro hac vice to be submitted)*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN, INC., a Montana nonprofit corporation; ALLIANCE FOR THE WILD ROCKIES, INC., a Montana nonprofit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBYN THORSON, Pacific Region Director, U.S. Fish and Wildlife Service; U.S. FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior; S.M.R. JEWELL, Secretary, U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR, a federal executive department of the United States. <br><br> Defendants. | Cause No.: <br><br> **COMPLAINT** |

**Complaint**                                                                                     1

Plaintiffs Friends of the Wild Swan and Alliance for the Wild Rockies, by and through their attorneys, state their claims for relief as follows:

## I. INTRODUCTION

1.      This case arises from the Defendants' approval of a legally deficient Recovery Plan (Plan) for the conservation and survival of the bull trout (*Salvelinus confluentus*), as required by Section 4(f) of the Endangered Species Act (the "ESA"), 16 U.S.C. § 1533(f).  This case marks the 7th time in 20 years that these Plaintiffs have sued the Defendants to require them to comply with their obligations of the ESA to list bull trout, designate its critical habitat, and now establish a recovery plan for the species that will lead to their conservation, recovery and eventual de-listing.  Bull trout was listed as a threatened species under the ESA approximately 17 years ago.  During that time, bull trout populations have remained in a precarious state, as the human-caused threats that led to their listing under the ESA have remained present or even accelerated.  Now the accelerating warming and seasonal drying of the Western United States from largely unfettered human deposition of carbon and other pollutants into the atmosphere will further imperil the species.  Section 4(f) of the ESA requires the Defendants to develop and implement a final recovery plan for the bull trout.  While the Defendants have now prepared a Plan (following a lawsuit requesting them to do so), the Plan fails to insure the long-term survival and recovery of the species, ignores the best available science, ignores its own previous findings about the status of bull trout and what they need for recovery and instead relies on novel and inadequate criteria for recovery devoid of any objective population criteria. Accordingly, the Plaintiffs have commenced this action to respectfully request that the Court declare the Plan in violation of the requirements of the ESA and order the Defendants to prepare a Plan that will insure the survival and recovery of the species.

## II. PARTIES

2.        Plaintiffs Alliance for the Wild Rockies Inc., and Friends of the Wild Swan, Inc., are both membership-based Montana nonprofit public benefit corporations.  The Plaintiffs and their members have a longstanding interest in the protection of the bull trout and the aquatic environment that bull trout depend on in the Northern Rockies and Pacific Northwest.

3.        Plaintiff Friends of the Wild Swan Inc. is a tax exempt, public-benefit Montana non-profit corporation. Its principal place of business is in Swan Lake, Lake County, Montana. Friends of the Wild Swan is dedicated to protecting and restoring water quality and fish and wildlife habitat in Montana.

4.        Plaintiff Alliance for the Wild Rockies Inc. is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 members, many of whom live in watersheds with bull trout habitat. Members of the Alliance are researchers, scientists, naturalists, and nature enthusiasts who observe, enjoy, fish for and appreciate Montana's native fish, water quality, and aquatic habitat quality, and expect to continue to do so in the future.

5.         Plaintiffs' members observe, fish, and otherwise enjoy and appreciate the aesthetic beauty of the bull trout in its natural habitat on a regular and on-going basis throughout the species' range, and expect to continue to do so in the future.  The Plaintiffs and their members are adversely affected by the decline in bull trout populations and habitat, and by inadequate government efforts to protect the species including failing to approve a recovery plan that meets the requirements of the ESA.  The recovery plan is the government's blueprint to fully recover the species, and Defendants' approval of an inadequate Plan hurts the recovery of bull

**Complaint**                                                                                                                                    **3**

trout to the detriment of Plaintiffs' members.  In particular, the aesthetic, recreational, and

economic interests of the Plaintiffs and their members are directly and adversely affected by the

failure of the Defendants to develop and implement a final recovery plan for the bull trout that

complies with the law.  In addition, the Plaintiffs and their members have an interest in ensuring

that the Defendants adhere to the substantive law and procedures required by the ESA for the

protection of bull trout, and in ensuring that the best scientific information regarding bull trout is

used in the recovery plan process and is available to the public.  The Defendants' actions as

alleged herein – and, more precisely, the Defendants' failure to take action as required by the

ESA – have harmed those interests as well.  This suit is brought on behalf of each Plaintiff

organization and on behalf of its members who are directly and adversely affected by the

Defendants' violations of the ESA.

6.    The Defendants are described as follows:

a.    Robyn Thorson is the Pacific Region Director of the U.S. Fish and

Wildlife Service, located in Portland, Oregon.  She is sued in her official capacity.

b.    The U.S. Fish and Wildlife Service (the "Service") is the agency in charge

of administering the ESA, including developing and implementing recovery plans for threatened

and endangered species.

c.    Sarah Margaret Roffey Jewell is the Secretary of the Interior, and is the

government official with overall responsibility for implementation of the ESA.  She is sued in

her official capacity.

d.    The U.S. Department of the Interior is the federal executive department

that houses the U.S. Fish and Wildlife Service, and which therefore has overall responsibility for

the implementation of the ESA.

**Complaint**                                                                                                                **4**

## II. JURISDICTION AND VENUE

7.    The Court has jurisdiction of this matter pursuant to 28 U.S.C. §1331, because this matter arises under the laws of the United States, and the Defendants are agencies or officials of the United States.  The Court also has jurisdiction under 16 U.S.C. §1540 (c) and (g), pursuant to citizen suit provisions of the ESA, or, alternatively, under the APA, 5 U.S.C. §701 *et seq.*  The Court may issue declaratory judgment and further relief pursuant to 28 U.S.C. § 2201 and 2202.  Mandamus may lie pursuant to 28 U.S.C. §1361.  There is a real and present controversy between the parties.

8.    Venue in this action is conferred upon this Court by 28 U.S.C. § 1391(e)(1)(a), which provides that a civil action against an agency of the United States or any officer thereof may be brought in any judicial district in which the officer resides.  Defendant Thorson, Pacific Region Director of the U.S. Fish and Wildlife Service, resides in this District.  The Regional Office is the lead office for bull trout listing, critical habitat and recovery planning.  In addition, venue is proper under 28 U.S.C. § 1391(e)(1)(b) because a significant part of the subject matter of this action – listed populations of bull trout – are located in this District, and also because a substantial part of the events or omissions giving rise to the claims occurred here.  Moreover, this Court has previously adjudicated approximately eight other cases involving bull trout.

## III. GENERAL ALLEGATIONS

A.    ***Background on Bull Trout***

9.    Native to the Pacific Northwest and Northern Rockies, bull trout were historically widely distributed and abundant in major river systems as well as smaller mountain streams. During the last 100 years, bull trout populations have declined precipitously, both in number and range.  Compared to other salmonids, bull trout have more specific habitat requirements that appear to influence their distribution and abundance. These habitat components include very cold

water temperature, cover, channel form and stability, valley form, stream elevation, spawning

and rearing substrates, and migratory corridors.  Human activities in bull trout habitat over the

last century, such as logging, road construction, dams, mining, grazing and urban development,

have negatively impacted bull trout habitat, causing widespread and significant population

declines and local extirpations.  In addition, overfishing and the introduction of exotic species

have contributed to the ongoing demise of the species.

      10.     Bull trout exhibit one of four different life history forms: resident, fluvial,

adfluvial, and anadromous.  Resident bull trout are non-migratory and spend their entire life

cycle in the same or nearby streams.  Unlike migratory forms, resident bull trout do not distribute

themselves throughout an entire basin, and therefore do not recolonize vacant habitats.  They

face threats of habitat degradation, competition and predation by exotic species and are

particularly vulnerable to stochastic events.

      11.     Fluvial, adfluvial and anadromous bull trout are migratory.  These migratory

forms spawn in tributary streams and, as juveniles, migrate either to lakes (adfluvial), large rivers

(fluvial), or salt water (anadromous) to mature.  Mature migratory bull trout return to small

tributary streams to reproduce.  Large migratory bull trout can exceed 30 pounds. Migratory bull

trout facilitate genetic interchange among local and regional populations and ensure sufficient

variability within populations.  They also serve to recolonize local populations extirpated by

natural or human-caused events.  Migratory bull trout have been restricted or eliminated from

most of their habitat due to human activity, including dams; irrigation diversions; detrimental

changes in water quality; increased water temperature; and the alteration of natural stream flow

patterns from logging, mining and grazing.  Persistence of these migratory life history forms and

maintenance or reestablishment of stream migration corridors is essential to the ultimate viability

of the bull trout.

**Complaint**                                            **6**

12.    Bull trout are extremely sensitive to changes in their habitat.  They require clean, cold water that is free of barriers to migration, with clean gravel in headwater creeks on which to spawn.  Bull trout also require migration corridors where water temperature and habitat conditions are conducive their survival and long-term presence.  Accordingly, the development and implementation of a final recovery plan is essential to the bull trout's protection, conservation and recovery.

13.    In addition to the above-discussed factors that have impacted bull trout and its habitat, anthropogenic-induced changes to the climate of the Pacific Northwest and Northern Rockies has, and will continue to affect bull trout habitat. These changes include warmer air and water temperatures, reduced stream flows, increased late-summer low stream flows, increased catastrophic wildfire, and more intense flooding events.  The adverse effects of climate change on bull trout will steadily worsen throughout the 21st century as carbon dioxide and other heat trapping pollutants continue to accumulate in the atmosphere.  The failure of homo sapiens to reduce their green house gas emissions has foreclosed meaningful reduction in heat-trapping pollutants for the next several decades and perhaps the next century, which is likely to cause even more extreme weather changes that will adversely affect bull trout.  These changes will reduce available bull trout habitat, stress existing populations and allow more heat tolerant non-native species to out-compete bull trout.

14.    Scientific research has demonstrated the precarious and tenuous nature of the remaining bull trout populations, and has established the need to protect these populations from the human activities that have caused their decline.  This scientific research formed the basis for the decision to protect bull trout under the ESA.  Furthermore, recent research has demonstrated the importance of preserving all remaining populations of bull trout, given the need to preserve genetic variation in different populations, the fact that many existing populations are isolated and

threatened with extirpation, and the wide-ranging nature of the species.  Developing and implementing a final recovery plant is an essential step in preserving all remaining bull trout populations and ensuring the recovery of the species.

**B.**   ***Administrative and Legal Proceedings Regarding Bull Trout***

15.    On October 27, 1992, the Plaintiffs petitioned the Service pursuant to 16 U.S.C. § 1533 and 50 C.F.R. § 424.14 for a rule to list the bull trout as an endangered species throughout its range with concurrent designation of critical habitat.  Plaintiffs also requested emergency listing and critical habitat designation for bull trout in select ecosystems where the species faces an imminent threat of extinction.

16.    On May 17, 1993, the Service found Plaintiffs' petition to contain substantial information indicating that a listing may be warranted.  *See* 58 Fed. Reg. 288849.

17.    Although the Service was required under the ESA to rule on the merits of such Petition within twelve months, *see* 16 U.S.C. § 1533(b)(3)(B), the Service failed to do so. Accordingly, on February 8, 1994, the Plaintiffs filed suit to compel such a ruling.  *Alliance for the Wild Rockies, et al. v. Babbitt*, Civ. No. 94-0246 (JLG) (D.D.C. 1994).

18.    Pursuant to a stipulation to resolve the Plaintiff's lawsuit, the Service, through the Pacific Region office in Portland, issued a twelve-month Administrative Finding on June 10, 1994, and the lawsuit was dismissed.  The Service made a number of factual findings regarding the widespread decline of the bull trout, its extirpation from vast portions of its historical range, the demise of its habitat due to human activity, and the inadequacy of existing government efforts to protect bull trout.  These findings led the Service to conclude that listing the bull trout as an endangered species throughout its range was warranted.  Despite these findings, however, the Service concluded that a final rule listing the bull trout as endangered was precluded due to other higher priority listing actions.

**Complaint**                                                                                                                        **8**

19.    Plaintiffs then filed suit before this Court, challenging the Service's decision not to list the bull trout as endangered.  In November 1996, after numerous legal proceedings, Judge Jones held that the Service's determination that listing the bull trout was "warranted but precluded" was arbitrary and capricious, and in violation of the ESA.  *Friends of the Wild Swan v. U.S. Fish and Wildlife Service*, 945 F. Supp. 1388 (D. Or. 1996).  The Court thus granted summary judgment to Plaintiffs on all claims, resulting in the publication of a proposed rule to list bull trout throughout the Columbia River Basin.  62 Fed. Reg. 32268 (June 13, 1997).  On June 10, 1998, the Columbia River Basin and Klamath population of bull trout were listed as threatened and endangered, respectively.  Klamath and Columbia Populations Final Rule, 63 Fed. Reg. 31647 (1998) (codified at 50 C.F.R. pt. 17).

20.    The Service then segregated three other sub-populations of bull trout as Distinct Population Segments and found them not warranted for listing.  Plaintiffs again filed suit, challenging the splitting of the populations as arbitrary based on the Service's earlier consideration of the entire bull trout population.  Judge Jones again issued summary judgment for Plaintiffs, which resulted in publication of a proposed rule to list the remaining populations of bull trout.  *Friends of the Wild Swan v. U.S. Fish and Wildlife Service*, 12 F. Supp. 2d 1121 (D. Or. 1997).    The Jarbidge population was listed as threatened on April 8, 1999, and the Coastal-Puget Sound and St. Mary-Belly River population was listed as threatened on November 1, 1999.  Jarbidge Population Final Rule, 64 Fed. Reg. 17110 (1999) (codified at 50 C.F.R. pt. 17); Coastal-Puget Sound and St. Mary-Belly River Population Final Rule, 64 Fed. Reg. 58909 (1999) (codified at 50 C.F.R. pt. 17).

21.    These populations are collectively referred to as the "listed populations" in this Complaint.  By this reference Plaintiffs do not agree biologically or legally with the Service's segmentation of bull trout populations, but that decision is not challenged herein.

**Complaint**                                                                                                                      **9**

22.     On January 26, 2001 Plaintiffs filed suit against the U.S. Fish and Wildlife Service for failing to designate critical habitat for bull trout as required under the Endangered Species Act. A year later plaintiff groups and USFWS reached a settlement agreement setting out timeline for critical habitat designation. On November 29, 2002 USFWS proposed critical habitat for 18,450 miles of streams and 532,700 acres of lakes in Montana, Idaho, Washington and Oregon. (67 FR 71235) In June 2004 USFWS proposed critical habitat for the Coastal-Puget Sound, St. Mary-Belly River and Jarbidge bull trout populations. (69 FR 35768)

23.     On October 6, 2004 the USFWS published the final bull trout critical habitat rule designating only 1,748 miles of streams and 61,235 acres of lakes in the Columbia and Klamath River basins.  No critical habitat was designated in Montana. (69 FR 59995) Plaintiffs filed suit in December 2004 for failing to designate an adequate amount of critical habitat to ensure the survival and recovery of bull trout in the Columbia and Klamath Basins and challenging the designation as politically motivated by then Under-Secretary Julie MacDonald. The case was voluntarily remanded back to the agency for revision in April 2005.

24.     On September 26, 2005 the USFWS issued a new critical habitat designation for: Columbia, Klamath, Coastal-Puget Sound, Jarbidge and St. Mary Belly River.  The designation totaled approximately 3,828 miles of stream, 143,218 acres of lakes in Idaho, Montana, Oregon and Washington and 985 miles of shoreline paralleling marine habitat in Washington. (70 FR 56212) In January 2006 Plaintiffs again filed suit against the critical habitat final rule for being inadequate.

25.     On March 23, 2007 the Dept. of the Interior Inspector General released a report alleging possible interference by Deputy Assistant Secretary of the Interior Julie MacDonald with the bull trout critical habitat designation. On December 15, 2008 the Inspector General released a new investigative report concluding that Julie MacDonald did interfere with the

**Complaint**                                                                                                    **10**

designation of critical habitat for bull trout in several instances. She had instructed agency biologists to abandon the best available science, to exclude all federal lands and exclude all lands that had any "plan" governing land use whether that plan was adequate or specific to bull trout.

26.    On October 18, 2010 the USFWS issued the final rule on bull trout critical habitat that included:  19,729.0 mi of streams in Montana, Idaho, Washington, Oregon and Nevada; 754.0 mi of marine shoreline in Washington; and 488,251.7 ac of reservoirs and lakes in Montana, Idaho, Washington and Oregon. (75 FR 63898.)  The final critical habitat designation identified specific areas within each of the six new draft recovery units that contain the physical or biological features essential to bull trout conservation, considering distribution, abundance, trend, and connectivity needs. The objective was to ensure the areas proposed for designation as critical habitat would effectively achieve the principles the USFWS believes are important for recovery: (a) Conserve the opportunity for diverse life-history expression; (b) conserve the opportunity for genetic diversity; (c) ensure bull trout are distributed across representative habitats; (d) ensure sufficient connectivity among populations; (e) ensure sufficient habitat to support population viability (e.g., abundance, trend indices); (f) address threats, including climate change; and (g) ensure sufficient redundancy in conserving population units. These recovery principles take into account the threats and physical or biological needs of the species throughout its range, and focus on the range-wide recovery needs. To help determine which specific areas contained the physical or biological features essential to bull trout conservation, USFWS considered the species' status in each recovery unit by evaluating whether: (a) Bull trout are rare and exposed to threats, such that recovery needs include removing threats from essentially all existing occurrences and restoring bull trout to portions of their historic range; or (b) bull trout are declining and exposed to threats, such that recovery needs include stopping the decline and eliminating threats across key portions of their range, such as currently occupied

strongholds. In some areas, USFWS determined that specific areas outside the geographical area occupied by bull trout at the time of listing are essential for the conservation of the species, and they were designated as critical habitat. In those areas, bull trout habitat and population loss over time necessitates reestablishing bull trout in currently unoccupied habitat areas to achieve recovery. The primary consideration for designating critical habitat for occupied areas was to protect species strongholds for spawning and rearing, and foraging, migration and overwintering (FMO) habitats. The primary consideration for designating most of unoccupied areas we are including in this designation was to restore connectivity among populations by protecting FMO habitats

27.     In 2004 the Service undertook a five year status review to determine whether bull trout were still warranted for listing. In April 2008 the Service determined that bull trout should remain a threatened species. The Service cited bull trout's reliance on the 4C's (i.e., clean, cold, complex, and connected habitats); fragmentation of the species' range by various threats at multiple scales, impacting the ability of the species to persist; invasive species such as lake trout that are a direct and increasing threat to many strong populations; anticipated ongoing and likely additional threats expected to create local extirpation in core areas; and low likelihood that existing threats will be eliminated and species status will improve.  Evolutionarily, the bull trout uses multiple life history strategies to reduce risk, but fragmentation of its habitat by dams, water diversions, and culverts has adversely affected this strategy.  Roads present an additional threat.

28.     The 2008 Status Review evaluated bull trout population, abundance and trend and made the following observations: most population trends are unknown; there is a broad distribution of risk across the landscape; most core area bull trout populations are at high risk or at risk; and the smallest core areas tend to be at a higher risk. Overall, no broad trend can be described for bull trout population abundance range-wide. There has been no change in the

distribution of bull trout in core areas since listing. There continues to be limited information on demographic features across the coterminous range.

29.    The Status Review also found that connectivity of habitat within and among core areas is low and new information affirmed that the use of migratory corridors is critical to the survival of bull trout. The review analysis indicated that 75 of the 121 (64%) core areas face either imminent, substantial, or moderate threats. Changes in habitat condition vary across and within core areas. Some habitat improvements (e.g., passage improvements, stream restoration, diversion screening, road decommissioning) have occurred at the local population level within individual core areas since the time of listing, however, no monitoring is in place to measure results and their effects to bull trout. In other areas, modification and destruction of habitat continue to threaten bull trout from a wide array of ongoing land uses such as forest management, road building, and development.

30.    Plaintiffs sent a 60 day notice to the USFWS on April 1, 2013, advising them that they must complete a recovery plan for bull trout. USFWS responded on June 3, 2013, that they were preparing a recovery plan and they anticipated a Federal Register notice being available by January 30, 2014. USFWS did not meet their own deadline so Plaintiffs filed a complaint on April 1, 2014. A settlement was reached on August 14, 2014, with the USFWS agreeing to complete a draft recovery plan and publish a notice of availability in the Federal Register no later than September 30, 2014, and a final recovery plan notice of availability would be published no later than September 30, 2015.

C.    *Recovery Plans Under the ESA*

31.    ESA Section 4(f) requires that the Service "shall develop and implement" a recovery plan for each threatened or endangered species, "unless [the agency] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1); *Southwest Ctr.*

*for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1136 (S.D. Cal. 2006) ("The statutory

scheme contemplates orderly and timely progression of action to list the species; designate its

critical habitat; and create a recovery plan."). A recovery plan provides a critical roadmap,

detailing management measures necessary to reduce and eventually eliminate a species' risk of

extinction, designing and funding research priorities, and securing cooperation from other

federal, state, regional, and local governmental and private entities. *See Fund for Animals v.*

*Babbitt*, 903 F. Supp. 96, 104 (D.D.C. 1995).

32.    Recovery Plans must contribute to the survival and conservation of the species,

and be based on the best available scientific data. *Fund for Animals v. Babbitt*, 903 F. Supp. 96

(D.D.C. 1995), *amended by* 967 F. Supp. 6 (D.D.C. 1997). In addition to the specific criteria

listed above, Recovery Plans must not be arbitrary and capricious – they must consider all of the

relevant factors, not just pre-ordained factors that Defendants have selected. Defendants must

ensure that the Recovery Plan leads to recovery and removal of the species from the list.

33.    The Service's own "Endangered and Threatened Species Recovery Planning

Guidance" publication (updated in June 2010) explains that the recovery planning process

consists of three phases. The planning phase involves the actual writing of the recovery plan.

Under the ESA, each recovery plan must identify: (1) "site-specific management actions" that

"may be necessary . . . for the conservation and survival of the species," (2) "objective,

measurable criteria which, when met, would result" in the species' delisting, and (3) "estimates

of the time . . . and the cost" required to achieve the plan's goals. 16 U.S.C. § 1533(f)(1)(B).

Further, the agency "shall, to the maximum extent practicable give priority to those . . . species . .

. that are most likely to benefit from such plans, particularly those species that are . . . in conflict

with construction or other development projects or other forms of economic activity." *Id.* §

1533(f)(1)(A). An agency must provide the public an opportunity for notice and comment

before finalizing a recovery plan. *Id.* § 1533(f)(4).  This phase therefore includes solicitation and incorporation of comments via peer review and public comment.  Final recovery plans "should be completed within 2.5 years of listing."  Guidance at 1.5.1.

34.    The third and final phase consists of the actual implementation of the recovery actions called for in the recovery plan, as well as monitoring of implementation and the effectiveness of the actions, and adaptation of the plan, if necessary.

35.    As explained by the Service, the development and implementation of recovery plans is necessary to the protection of listed species, and fulfills the ultimate goal of the ESA in recovery and eventually removing such species from the ESA's protection.  In this connection, a recovery plan is vitally important because it spells out the variety of actions needed to achieve recovery. "[W]ithout a plan to organize, coordinate and prioritize the many possible recovery actions, the effort may be inefficient or even ineffective."  Guidance at 1.1.  The prompt development and implementation of recovery plans "ensures that recovery efforts target limited resources effectively and efficiently into the future."  *Id.*  Recovery plans are a "road map for species recovery – [they] lay[] out where [the Service] needs to go and how best to get there." *Id.*  As such, recovery plans are "one of the most important tools" to ensure sound decision making throughout the recovery process.  *Id.*

36.    On September 9, 2015, pursuant to the settlement agreement reached between these parties in previous litigation, Defendants released their Recovery Plan for the Coterminous United States Population of Bull Trout (*Salvelinus confluentus*) (the "Plan").

37.    On October 7, 2015 the Plaintiffs sent Defendants a 60-Day Notice of Intention to sue outlining the legal deficiencies in the Plan that are the subject of this Complaint.  In the 60-Day Notice Plaintiffs raised the basic issues that are the subject of this lawsuit. More than 60

**Complaint**                                                                                                   **15**

days have elapsed and the Defendants did not respond or take action to remedy the defects in the Plan.

38.    Bull trout habitat remains under increasing pressure from human activities, and the outlook for remaining bull trout populations is tenuous.  During the time that it has taken for the Defendants to provide adequate Critical Habitat and a final Recovery Plan, bull trout have remained threatened from the same human activities that caused them to be listed under the ESA. Bull trout are susceptible to impacts caused by human degradation of the atmosphere by the continuous, constantly accelerating human-caused deposition of pollutants in our global atmosphere commonly referred to as "Green House Gases."  The dramatic acceleration of GHG pollution since bull trout were listed has already led to increasing temperatures, reduced snowpack especially at lower elevations, reduced late summer stream flows that lead to restrictions on fishing seasons, and warmer water temperatures that favor the non-native species that humans, in their prescience, decided to introduce into trout waters decades ago. Near universal scientific consensus is that human alteration of the atmosphere will cause the Western United States where bull trout reside to become hotter (by as much as 5 degrees Fahrenheit) and seasonally drier (particularly in late summer) during the course of this century, adding cumulatively to the other factors that caused the species to become imperiled.

39.    Section 4(f) of the ESA requires the Defendants to develop a Plan that incorporates:

> (i)    a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

> ii)    objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and;

**Complaint**                                                                                                    **16**

(iii)     estimates of the time required and the cost to carry out those measures

needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

As set for below in the Claims for Relief, the Defendants have failed to comply with this

legal mandate.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF THE ENDANGERED SPECIES ACT

40.     Plaintiffs reallege all previous paragraphs as if set forth in full.

41.     The Plan allows 25% of the Coastal, Mid-Columbia, Upper Snake, and Columbia

Headwaters Recovery Units to be extirpated.

42.     Bull trout populations had decreased by 60% by the time the species was given

Endangered Species Act protection. The Plan implies that the Services assume there is flexibility

to make management choices deliberately allowing some core area populations of bull trout to go

into decline or extinction, on the expectation others will appear from scratch, or disperse from

severely depressed relict populations elsewhere in the Recovery Unit to arise in new locations.

However, the Plan, the previous listing and recovery planning record, and the published

scientific literature present virtually no evidence to substantiate that new populations of bull trout

have established in contemporary times, either at the Core Area scale or the next smaller scale of

breeding populations.

43.     The Plan does not explain why the extirpation of bull trout from any extant core

area does not irretrievably foreclose future recovery opportunity, and therefore materially reduce

the likelihood that the species will not be endangered in the future.

44.     The 5-year status review (USFWS 2008) is the only quantitative assessment

available to date of status of individual core areas across the range of bull trout.  Of the then 121

core areas identified, over half were of unknown population status—itself a most troubling

**Complaint**                                                                                                    **17**

statistic. Of the 55 core areas for which assessment was possible, bull trout populations in 42%

(23) of them were reported to be declining; just 32% (18) were thought to be stable, and 25%

(14) were reportedly increasing.    With more than 40 percent of the total collection of core areas

reported in decline, there is little leeway for sanctioning further declines in the stable or

increasing portion of the species range.

45.    Allowing 25% of the Coastal, Mid-Columbia, Upper Snake, and Columbia

Headwaters Recovery Units to be extirpated is a violation of the ESA.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE ENDANGERED SPECIES ACT**

46.    Plaintiffs reallege all previous paragraphs as if set forth in full.

47.    The Plan's recovery goals, objectives and criteria are not consistent with NMFS-

FWS Interim Recovery Planning Guidance 2010, Bull Trout Recovery: Monitoring and

Evaluation Guidance 2008, and the 2010 Bull Trout Critical Habitat Final Rule.

48.    The Plan identifies the seven principles of conservation from the Recovery

Planning Guidance:

    (1)    conserve the opportunity for diverse life-history expression;

    (2)    conserve the opportunity for genetic diversity;

    (3)    ensure bull trout are distributed across representative habitats;

    (4)    ensure sufficient connectivity among populations;

    (5)    ensure sufficient habitat to support population viability (e.g., abundance,

trend

    indices);

    (6)    address threats, including climate change; and

    (7)    ensure sufficient redundancy in conserving population units.

**Complaint**                                                                                                    **18**

49.    The Plan fails to incorporate other components of the Recovery Planning Guidance, including:

(1)    Recovery criteria will usually also include population numbers, sizes, trends and distribution, population structure or recruitment rates, specific habitat conditions, and minimum time frames;

(2)    Addressing threats in recovery criteria. Recovery criteria include population numbers, sizes, trends, and distribution.

(3)    Recovery Plans include demographic criteria, such as abundance and distribution, separate from "threats-based" criteria.

(4)    Population Viability Analyses are not replacements for threat-based criteria, but are supplements. The criteria describe the conditions in which a Population Viability Analysis indicates long-term viability.

50.    The Plan fails to incorporate the recovery objectives identified in the Bull Trout Recovery: Monitoring and Evaluation Guidance (2008), which include the following: distribution, abundance, habitat, genetics. These are all considered important characteristics of population viability and recovery.

51.    The 2002 Draft Bull Trout Recovery Plan established four broad "recovery objectives" for bull trout that are absent from the Plan:

(1)    maintain current distribution of bull trout and restore distribution in previously occupied areas;

(2)    maintain stable or increasing trends in abundance of bull trout;

(3)    restore and maintain suitable habitat conditions for all bull trout life history stages and strategies; and

**Complaint**                                                                                      **19**

(4)    conserve bull trout genetic diversity and provide opportunity for genetic exchange.

52.    The Plan fails to incorporate the principles deemed important for recovery in the 2010 Bull Trout Critical Habitat Final Rule because they take into account the threats and physical or biological needs of the species, including:

(1)    conserve the opportunity for diverse life-history expression;

(2)    conserve the opportunity for genetic diversity;

(3)    ensure bull trout are distributed across representative habitats;

(4)    ensure sufficient connectivity among populations;

(5)    ensure sufficient habitat to support population viability;

(6)    address threats, including climate change; and

(7)    ensure sufficient redundancy in conserving population units.

53.    The failure of the Plan to include these important considerations as alleged here is a violation of the Endangered Species Act.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF THE ENDANGERED SPECIES ACT

54.    Plaintiffs reallege all previous paragraphs as if set forth in full.

55.    Demographic criteria are not included in the Plan.

56.    The Plan discards reliance on quantitative targets for bull trout population size, number, life history diversity as factors for determining whether recovery is occurring; i.e., delisting criteria.   Instead the Plan relies almost exclusively on the Service's perception of whether identified threats have been "managed" to both structure and assess recovery.  In so doing, the Service discards a large body of scientific literature and well-established scientific conventions for describing population and species status and recovery under the Endangered

Species Act and in other fishery restoration programs.

57.     The Plan does not explain why key data sources — such as bull trout redd count time series, observation of presence of migratory life histories within populations, field surveys of bull trout distribution and change in distribution over time, and genetic estimates of effective population size — are no longer to be considered in establishing delisting criteria for bull trout. Each of these data sources has well-established protocols and methods, and known accuracy established through many years of research on bull trout (e.g., Rieman and McIntyre 1996, Rieman and Myers 1999, Dunham et al. 2001, High et al. 2008). Published scientific applications have shown how evaluation of time series in bull trout spawner counts has been instrumental in understanding the habitat and environmental factors underlying population trends and the robustness and recovery of populations within core areas (e.g., Rieman and McIntyre 1996, Baxter et al.1999).

58.     The Plan relies on managing primary threats as the means to characterize recovery. This reliance is based on a complex set of assumptions about the ways that threats act on the habitat and population ecology of bull trout to determine population viability.  Erroneous assumptions about the outcomes of threat management are highly likely — in fact, virtually certain — if the underlying assumptions of cause and effect are not empirically checked against measured biological outcomes. The Plan fails to provide for such an empirical verification.

59.     Scientific research has demonstrated the potentially enormous value of allelic, genomic and population genetic information for understanding and predicting population viability, including size, exchange of individuals with other populations, and the development, fixation, or evolution of local genetic traits (Whitely et al. 2006, Ardren et al. 2011). The Plan does not provide for such collection of this genetic information, and does not consider

demographic threats such as inbreeding, loss of genetic variation, and loss of evolutionary potential.

60.    The failure of the Plan to include important demographic information as alleged here is a violation of the Endangered Species Act.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE ENDANGERED SPECIES ACT

61.    Plaintiffs reallege all previous paragraphs as if set forth in full.

62.    The Plan places no reliance on habitat metrics for assessing population status and delisting criteria.

63.    USFWS has already determined with the critical habitat designation that bull trout need certain habitat components called Primary Constituent Elements (PCEs). The Plan does not contain any habitat standards or explain how managing primary threats will achieve the habitat conditions that bull trout require or provide the PCEs.

64.    Physical habitat information is crucial to assure that threat reduction is actual and effective, and not a paper exercise, and much useful information specific to bull trout conservation has already been published.  Heedless, the Plan lacks any critical examination or disclosure about how the effects of threats or their treatment on habitat and population viability will be informed prior to action, or verified after action.

65.    The failure of the Plan to include habitat metrics as alleged here is a violation of the Endangered Species Act.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF THE ENDANGERED SPECIES ACT

66.    Plaintiffs reallege all previous paragraphs as if set forth in full.

**Complaint**                                                                                      **22**

67.     USFWS intends to govern recovery and delisting on the basis of ameliorating primary threats, yet the Plan fails to effectively or objectively evaluate threats, and the Recovery Unit Implementation Plans do not contain a complete listing and assessment of threats.

68.     The Plan offers no systematic or scientifically defensible framework for the quantitative characterization of threats, or for the many potential interactive effects of multiple threats acting on bull trout habitat and populations.

69.     The failure of the Plan to effectively or objectively evaluate threats as alleged here is a violation of the Endangered Species Act.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE ENDANGERED SPECIES ACT**

70.     Plaintiffs reallege all previous paragraphs as if set forth in full.

71.     The Plan relies on adaptive management and monitoring that are vaguely defined and lack protocols.

72.     Effective adaptive management for biological restoration and species recovery requires close attention to defining testable treatments, adequate scientific engagement in monitoring, analysis, and reporting of results, followed by a formal decision process that is triggered by a predetermined threshold response in the data, and is bounded by meaningful *a priori* biological criteria to gauge outcomes (McDonald et al. 2002, Murphy and Weiland 2014, Westgate et al. 2014).

73.     The Plan lacks any such process for its adaptive management regime.

74.     The Plan simply identifies adaptive management as an undefined means of resolving (entirely unspecified) uncertainties and potentially improving (in no specified way) future decisions and actions—with no identified means of providing the species a hedge against experimental actions or inactions that could cause widespread, irreversible harm.

75.    The Plan's reliance on vaguely defined monitoring and adaptive management as alleged here is a violation of the Endangered Species Act.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE ENDANGERED SPECIES ACT

76.    Plaintiffs reallege all previous paragraphs as if set forth in full.

77.    USFWS has provided no clear evidence or demonstration that a general finding of "threats are managed" can be made with sufficient certainty that it should be the primary basis of permitting and species protection, recovery, and potential delisting.  The Plan also fails to provide clear operational guidance for how such a determination is to be made for bull trout.

78.    The failure of the Plan to provide clear operational guidance on determination of threat management as alleged here is a violation of the Endangered Species Act.

## EIGHTH CLAIM FOR RELIEF
## VIOLATION OF THE ENDANGERED SPECIES ACT

79.    Plaintiffs reallege all previous paragraphs as if set forth in full.

80.    The Plan does not adequately address the effects of climate change on the cold water habitat that bull trout need for survival.

81.    The Plan appears to assume that because climate change may hasten the extinction of some populations and thwart restoration efforts in others, it is grounds for not adopting any quantitative criteria for population persistence or distribution.  However, the continued persistence of bull trout in arid and semiarid regions within the range of the bull trout indicates that persistence and potentially expansion of extant populations is possible under climatically stressed conditions if the natural hydrologic mechanisms that maintain water quality and habitat for bull trout are protected and restored.

82.    The Plan fails to identify and protect these hydrologic and ecological factors that confer resilience to extant bull trout populations.

83.    The Plan fails to incorporate any clear strategic assessment, prioritization, or specific slate of actions pertinent to sustaining these critical environmental actors and functions.

84.    The failure of the Plan to address the effects of climate change as alleged here is a violation of the Endangered Species Act.

### NINTH CLAIM FOR RELIEF
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

85.    Plaintiffs reallege all previous paragraphs as if set forth in full.

86.    In the alternative to the Claims for Relief under the Endangered Species Act, the APA grants this Court the authority to "hold unlawful and set aside… agency action found to be arbitrary, capricious or an abuse of discretion." 5 U.S.C. § 706(2).

87.    As described above, for each claim set forth above, USFWS has failed to consider relevant factors, failed to articulate a rational connection between the facts found and the decision made, and/or failed to follow applicable policy, regulation and law, all in violation of the APA.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for relief from this Court as follows:

A.    To issue a declaratory judgment that the Defendants are in violation of Section 4(f) of the ESA for the reasons set forth herein.

B.    In the alternative, to issue a declaratory judgment that the Defendants are in violation of the APA, 5 U.S.C. § 706(2).

C.    To issue a mandatory injunction ordering the Defendants to promptly develop and implement a lawfully adequate recovery plan for listed populations of the bull trout, and in no case to delay publishing a Notice of Availability for the draft revised recovery plan for more than more than 180 days from the date judgment.

**Complaint**                                                                                        **25**

D.    To award the Plaintiffs reasonable costs and attorney's fees incurred in

prosecuting this action.

E.    For any other relief this Court deems just and proper in this action.

Dated this 19th day of April, 2016.

/s/ Gary K. Kahn _____
Gary K. Kahn (Oregon State Bar #814810)
Peggy Hennessy (Oregon Bar #872505)
Reeves, Kahn, Hennessy & Elkins
4035 S.E. 52nd Avenue
P.O. Box 86100
Portland, OR 97286-0100
Telephone:  (503) 777-5473
phennessy@rke-law.com

/s/ Jack R. Tuholske_____
Jack R. Tuholske (Montana Bar # 2902)
TUHOLSKE LAW OFFICE, P.C.
1149 Harrison St.
P.O. Box 7458
Missoula, MT 59807
Telephone: (406) 396-6415
jtuholske@gmail.com
(pro hac vice to be submitted)

Timothy Bechtold (Montana Bar #4376)
Bechtold Law Firm, PLLC
317 E. Spruce Street
PO Box 7051
Missoula MT 59807
Telephone (406) 721-1435
tim@bechtoldlaw.net
(pro hac vice to be submitted)

*Attorneys for Plaintiffs*

**Complaint**                                                                                      26