Gary Kahn (Oregon Bar #814810)
Peggy Hennessy (Oregon Bar #872505)
Reeves, Kahn, Hennessy& Elkins
P.O. Box 86100
Portland, OR 97286-0100
Telephone:  (503) 777-5473
phennessy@rke-law.com

Jack R. Tuholske (Montana Bar # 2904)
TUHOLSKE LAW OFFICE, P.C.
P.O. Box 7458
Missoula, MT 59807
Telephone: (406) 396-6415
jtuholske@gmail.com

Timothy Bechtold (Montana Bar #4376)
Bechtold Law Firm, PLLC
PO Box 7051
Missoula MT 59807
Telephone (406) 721-1435
tim@bechtoldlaw.net

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| FRIENDS OF THE WILD SWAN, INC., a Montana nonprofit corporation; ALLIANCE FOR THE WILD ROCKIES, INC., a Montana nonprofit corporation, | |
| Plaintiffs, | Cause No.: 3:16-CV-00681-AC |
| vs. | **PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S FINDINGS AND RECOMMENDATION** |
| ROBYN THORSON, Pacific Region Director, U.S. Fish and Wildlife Service; U.S. FISH AND WILDLIFE SERVICE, an agency of the U.S. Department of the Interior; S.M.R. JEWELL, Secretary, U.S. Department of the Interior; U.S. DEPARTMENT OF THE INTERIOR, a federal executive department of the United States. | |
| Defendants. | |

# I.    INTRODUCTION

On January 5, 2017, Magistrate John Acosta entered Findings and Recommendation (F&R) in this matter, finding that Defendant U.S. Fish and Wildlife Service's (Service) Recovery Plan for bull trout was not a final agency action, that Plaintiffs here do not have a cause of action under the Endangered Species Act (ESA) or the Administrative Procedures Act (APA), and recommending that this Court dismiss Plaintiffs' claims for want for subject-matter jurisdiction. The Magistrate's misreading of the mandatory duties and responsibilities under the ESA's Section 4(f) Recovery Plan requirements led to a F&R that recommend complete dismissal of the case. The practical result of the Magistrate's Findings, if adopted by this Court, will potentially gut the substantive requirements of Recovery Plans by making them unreviewable, leave the Service with nearly unfettered discretion to produce inadequate Plans, completely ignore comments and suggestions by the scientific community and the public, and upend a key component of the ESA's ultimate goal to recover species and remove them from the protections of the Act. Denying access to the courthouse door shields the agency from any oversight in the development and implementation of a Recovery Plan.

The Findings and Recommendations should be rejected by this Court. Dismissal under Rule 12 (b) is wrong under either Section 704 of the APA (final agency action) or the Section 11 citizen suit provision of the ESA. These claims were properly pled in the alternative, because of the relative dearth of case law on the appropriate statutory basis for judicial review. However, as explained below, under Supreme Court jurisprudence and well-established, analogous case law, this Court has jurisdiction under one of those routes to proceed to the merits of this suit. In overturning the Magistrate's F&R, Plaintiffs don't ask the Court to opine about the merits of the Recovery Plan. That determination will be properly made after judicial review based on the

administrative record.   The Service will have every opportunity to defend its Plan for bull trout on the merits. Here the Service does not seek to defend its Plan, but rather to permanently bar any judicial scrutiny.

## II.     ESA BACKGROUND AND SUMMARY OF MAGISTRATE'S F&R

### A.  Recovery Plans Are A Critical Element of the ESA's Mandate to Protect, Recover and Delist Species.

ESA Section 4 contains the requirements and timelines to list species under the Act, to designate Critical Habitat, to prepare recovery plans as a basis for delisting the species, and finally, to delist a species when the species has reached a point where it is no longer in danger of extinction.  Recovery and delisting are integral to fulfilling the purpose of the statute; "The plain intent of Congress in enacting this statute [ESA] was to halt <u>and reverse</u> the trend toward species extinction, whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978) (emphasis added).  Congress attached great importance to both saving and recovering threatened and endangered species. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994).

The duty to prepare recovery plans is mandatory. 16 U.S.C. § 1533 (f) (1). The ESA states that the Service "**shall**, to the **maximum extent practicable** . . . incorporate in each plan" a description of site-specific management activities; objective, measurable criteria; and estimates of time and costs to carry out the plan. 16 U.S.C. §1533(f)(1)(B) (emphasis added).  The Service "shall" provide an opportunity for public comment when drafting and revising a recovery plan, and "shall consider all information presented by the public during the comment period…" 16 U.S.C. 1533 § (4) and (5). Congress imposed the same mandatory substantive requirements and public input for recovery plans as for listing, critical habitat designation and delisting because Recovery Plans are a critical piece of the overall statutory scheme.  Just as pieces of Section 4

(listing, critical habitat, delisting) are discrete final actions subject to judicial review, so too are recovery plans.

As the focal point of removing species from the list, it should include "the process that stops or reverses the decline of a species and neutralizes threats to its existence." *Defenders of Wildlife v. Babbitt*, 130 F.Supp.2d 121,131 (D.D.C. 2001).Recovery plans must be based on the best available scientific data. "A recovery plan that recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 108 (D.D.C. 1995), *amended by* 967 F.Supp.6 (D.D.C. 1997).

The Service's own guidance recognizes the determinative role that recovery plans play in laying the foundation for long-term species protection. The Service's "Endangered and Threatened Species Recovery Planning Guidance" publication (updated in June 2010) spells out the variety of actions needed to achieve recovery. "[W]ithout a plan to organize, coordinate and prioritize the many possible recovery actions, the effort may be inefficient or even ineffective." Guidance at 1.1. The prompt development and implementation of recovery plans "ensures that recovery efforts target limited resources effectively and efficiently into the future." *Id.* Recovery plans are a "road map for species recovery – [they] lay[] out where [the Service] needs to go and how best to get there." *Id.* As such, recovery plans are "one of the most important tools" to ensure sound decision making throughout the recovery process. *Id.*

**B. Summary of the Magistrate's F&R.**

Plaintiffs Friends of the Wild Swan and Alliance for the Wild Rockies' Complaint has nine separate counts challenging the Service's myriad failures with respect to the Bull Trout

Recovery Plan. Plaintiffs alleged both the ESA's citizen suit provision in §11, 16 U.S.C. §1540(g), as well as the APA, 5 U.S.C. §706(2), as alternative jurisdictional bases. Complaint ¶¶7-8. Counts 1 through 8 allege various violations of §1553(f) as citizen suit claims, while Count 9 subsumes Counts 1-8 and is actionable, alternatively, under the APA.

Plaintiffs challenge particular aspects of the Bull Trout Recovery Plan. For example, Plaintiffs have alleged *inter alia,* that the Service's Plan allows for the extirpation of large populations of bull trout without justification, (Count 1 ¶48); arbitrarily ignored its own recommendations in earlier draft recovery plans and Critical Habitat Guidelines (Count 2 ¶ 50-52). Plaintiffs further allege that the Plan's components either do not comport with the requirements of Section 4 (f) to include "objective, measurable criteria" defining bull trout recovery. (Count 3, ¶ 56-59; 63). Other allegations (taken as true for purposes of this motion) aver the Service ignored key, current science. (Counts 3 and 5 ¶ 59, 68). Further, Plaintiffs allege that Plan components are so lacking in substance, and fail to consider climate change impacts to this cold-water loving fish, that the Plan fails the statutory command that such plans, when implemented as required by the ESA, lead to the actual recovery (i.e. long term sustainable populations) of the species. (Complaint Counts 6, 7, 8).

The Magistrate concluded that this Court lacks jurisdiction under ESA's citizen suit provision to hear any claim challenging the "general substance" of a recovery plan. F&R at 15. The F&R stated that the Service has a mandatory duty to determine whether the three specific plan requirements cited above are practicable, and if practicable, to include them in the recovery plan. F&R at 16. The F&R found that this Court does have jurisdiction under 16 U.S.C. § 1540(g)(1(C) to review whether the Service considered the three required recovery plan

components contained in 16 U.S.C. §1533(b)(i) –(iii).    However the Magistrate found that it

lacked jurisdiction to review how the Service chooses to address these three items. F&R at 18.

The F&R found that Counts 1-8 of Plaintiffs' Complaint allege violations of §1533(f),

and cite specific alleged deficiencies of the Bull Trout Recovery Plan, "but do not identify how

such deficiencies violate the requirement to include" the three items identified in §1533(f)(1)(B).

F&R at 18. Since the F&R found that this Court's only basis of jurisdiction was to review

whether the Service gave merely mentioned the requirements of §1533 (f)(1)(B) (i) –(iii), and the

Complaint alleges substantive violations of these requirements, the Court concluded it lacks

jurisdiction over Counts 1-8 because "the Complaint fails to state a clam for violation of a non-

discretionary duty." F&R at 19.

The F&R next determined that the Bull Trout Recovery Plan is not a final agency action

for purposes of the APA because it "does not determine any rights or obligations and does not

require any immediate compliance with its terms. . . .the Plan merely describes management

actions, objective and measurable criteria, and time and cost estimates." F&R at 25. The F&R

therefore found that Plaintiffs' APA claims did not provide this Court with jurisdiction. F&R at

25, though the Magistrate provided scant legal authority for its analysis of APA jurisdiction.

Nowhere in the decision did the Magistrate consider the practical consequences of eliminating

any judicial review of recovery plans, despite the allegations (taken as true here) that the Bull

Trout Recovery Plan is so defective that it will not lead to the recovery of the species.

### III.    ARGUMENT

**A.  The APA Provides this Court with Jurisdiction Over Plaintiffs' Claim that the
Agency's Plan was Arbitrarily Approved.**

The APA grants jurisdiction to federal courts to review the substance of "final agency

actions" unless they are "committed to discretion by law." 5 U.S.C. §701. In determining

PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S FINDINGS & RECOMMENDATION-5

whether an agency action is final, two conditions must be satisfied: "first, the action must mark the 'consummation' of the agency's decision-making process… and second, the action must be one by which 'rights or obligations have been determined,' or by which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. at 177-78.  The APA, creates a "presumption of reviewability for all final agency action." *United States Army Corps of Eng'rs .v Hawkes Co.* 136 S. Ct. 1807, 1816 (2016); see also *Sackett v. EPA*, 566 U.S. 120, 128, 132 S. Ct. 1367, 1372-73 (2012). Courts approach the determination of what constitutes a final agency action subject to judicial review by considering the practical, real-world consequences of the agency's decision. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).

Count IX of the Complaint incorporates the allegations in Count 1-8, all into one alternative APA claim.  Plaintiffs pled in this manner because the issue of which avenue provides jurisdiction has not been decided by the courts.  As set forth below, *under* the two-part *Bennett* test this Court should not dismiss the complaint.

1.    The Recovery Plan is the consummation of the Service's decision-making process under Section 4 (f) of the ESA.

The ultimate goal of the ESA is to bring listed species to a point where they no longer require the Act's protections. The recovery plan is a crucial mechanism intended to actualize this goal. As the catalyst for the delisting process, recovery plans "shall be as long and detailed as is necessary and consonant with their purpose of providing a framework for actions directed at conserving, or at least, insuring the survival of subject species." H.R. Rep. No. 95-1625 at 19 (1978) *reprinted in* 1978 U.S.C.C.A.N. 9453, 9469. In an abnormally long and litigious listing process, the Service engaged in comprehensive, multi-decade decision-making, which concluded with its publication of the Final Bull Trout Recovery Plan.

Once a species is listed, ESA Section 4 lays out specific procedures the Service must follow to work towards delisting, including designating critical habitat and developing a recovery plan. Plaintiffs first petitioned the Service in 1992 to list the bull trout as endangered, beginning a 26-year legal battle over listing, unlawful designation of Distinct Population Segments, failure to designate Critical Habitat, and then improperly restricting Critical Habitat, based on political interference from the Bush Administration's Julie MacDonald. Complaint ¶¶ 15-30. Though listed in 1988, the Service did not publish the Bull Trout Critical Habitat Final Rule until 2010. Complaint ¶47. Between 2002 and 2004, three separate draft recovery plans were completed but never finalized. After another suit, the Service revised the draft recovery plan and released it for public comment in 2014. Complaint ¶ 30. The final Plan was released in 2015, a discrete action marking the completion of the Service's Bull Trout Recovery Plan decision-making process under Section 4 (f).

The Magistrate did not address the first prong of *Bennett,* and that prong is clearly met; the publication of the final Recovery Plan in the Federal Register is the consummation of the agency's decision-making process. In other words, the recovery plan process is complete. The Bull Trout Recovery Plan published in the Federal Register on September 30th 2015 is indeed the consummation of the Service's lengthy efforts under Section 4(f) to develop and publish a Bull Trout Recovery Plan. The administrative record will show that the public, including scientific organizations expressed serious concerns about the final product but the Service brushed aside these concerns and approved the final Plan. The publication of the final Plan is a final, discrete step. The actual process of recovering the species to the point of delisting is of course on-going; federal land managers, state wildlife agencies, timber companies and others will be taking steps

to implement the Plan's criteria as a prerequisite to delisting.  But the Recovery Plan at issue in this lawsuit is a finished final product.

> 2.    The Bull Trout Recovery Plan fixes rights and responsibilities that affect the Service, other federal agencies and the Plaintiffs.

Under the second prong of *Bennett*, an action must be one by which 'rights or obligations have been determined,' or by which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. at 177-78. Courts must further "focus on the practical and legal effects of the agency action" and look to whether the action "amounts to a definitive statement of the agency's position…" " *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).  With only limited discussion, the Magistrate concluded that Plan "does not determinate any rights or obligations and does not require any immediate compliance with its terms." F & R at 25.

The Recovery Plan determinates what rights and obligations of the Service and other federal agencies by establishing the criteria for delisting. The agency has described recovery as the "process by which the decline of an endangered or threatened species is arrested[]." Endangered Species Recovery Program, U.S. Fish and Wildlife Service Endangered Species Program, August, 2002, http://endangered.fws.gov/recovery/recovery.pdf. During this process, the agency uses its technical expertise to develop a blueprint for recovery. The Act itself also requires that a Recovery Plan incorporate "objective, measurable criteria which, when met, would result in the determination…that the species be removed from the list." 16 U.S.C. §1533 (4)(f)(B)(iii). These objective, measurable criteria provide an important means by "which to evaluate the Service's progress towards its goal of conserving species." *Friends of Blackwater* at 434.

Furthermore, the Recovery Plan is FWS's "definitive statement," *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006), of the actions that must be taken and

conditions that must be achieved for lawful delisting of the species and its removal from the
protections of the Act. 16 U.S.C. § 1533 (f) (1) (B) (ii). Recovery Plans must have "objective
measurable criteria" which lead to delisting. 16 U.S.C. § 1533 (f) (1) (B) (i), and the ones are
alleged to be seriously deficient. The Magistrate acknowledged these criteria but relied on
*Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012) to find that because the all
of terms of recovery plans do not require mandatory compliance before delisting, the plans are
not final agency actions under the APA.

> *Blackwater* is inapposite to the case at bar for two reasons. First, the case did not
involve a challenge to a recovery plan but rather was a challenge to a delisting decision. The
issue presented to this court – whether a court has jurisdiction to hear a challenge to a recovery
plan under the ESA or APA – was not addressed. Second, far from holding that recovery plans
are empty shells devoid of meaning, the D.C. Circuit looked to see whether the Service
arbitrarily deviated from the plan. 691 F.3d at 435-6 (Plaintiffs did not show Service's departure
from the plan was "arbitrary and capricious.").

> The Supreme Court did not establish the type of narrow litmus test for finality that the
Magistrate imposed here. Rather, in *Bennett*, the Supreme Court used a pragmatic approach
regarding the impact of an agency's action to assess finality. In fact, Justice Scalia stressed that
while the legal effect Biological Opinion may technically be "theoretical" (i.e. not legally
binding), *Bennett,* 520 U.S. at 169, its real-world consequences clearly affected government
agencies and ultimately the irrigators who were seeking judicial review. A similar analogy
applies here: the fact that some courts have held that recovery plans are not technically binding
on other agencies, their real-world impact, including the government's continual reliance on
recovery plans to justify delisting decisions, brings them within the ambit of APA jurisdiction.

PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S FINDINGS & RECOMMENDATION-9

The F&R points to the "non-binding" and "non-mandatory" nature of Recovery Plans as dispositive to their finality. F&R 25. Specifically, the F&R cites to the District of Columbia Circuit approval of the Service's analogy of a Recovery Plan to a map: reasoning the Service may "reach one's destination—recovery of species—by a pathway neither contemplated by the traveler setting out nor indicated on the map." F&R 25 (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012). The "map" comparison does not control the finality of the agency's action for purposes of APA jurisdiction.

A better approach than focusing on whether a specific recovery plan term is binding for all time is to consider the real-world consequences of recovery plans. Several cases illustrate the fact that recovery plans play a key role in determining how agencies address listed species. In *Alaska v Lubchenko*, 753 F.3d 1043 (9th Cir. 2013), the Ninth Circuit repeatedly discussed the importance of the Stellar Sea Lion Recovery Plan as a basis for upholding the National Marine Fisheries Service's (NMFS) decision not to allow commercial fishing in the recovery areas:

> NMFS therefore had to consider whether the proposed action, continued fishing, could prevent the species from achieving the Recovery Plan's goals for delisting. That is what NMFS did. Relying on the Recovery Plan, the agency concluded that the fishery reauthorizations would appreciably diminish the DPS's chances of recovery as the fishery could fully extirpate the species in at least one sub-region.

*Id.* at 1054. The practical effect of the recovery plan was that its terms were used to justify a significant closure of a commercial fishery. *See also id.* at 1053 ("Such extirpation [caused by allowing commercial fishing to remove a food source)] would render the Recovery Plan's goals unattainable.").

Courts have also used the criteria of a recovery plan in revising and re-designating Critical Habitat. The D.C. District Court reviewed the contents of a Multi-Species Recovery Plan (MSRP) in determining review and re-designation of critical habitat for the Cape Sable seaside

sparrow. *Biodiversity Legal Found v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003). The court

acknowledged the FWS has discretion to follow the recovery plans but found the MSRP "offered

more than 'general guidance' to the Service." *Id.* at 13. The court further noted the "MSRP

**committed** FWS to 'review and revise the current critical habitat designation.'" *Id.* (emphasis

added).  The D.C. District Court concluded:

> Given the Service's own assessment of the seaside sparrow's dire situation by 1999, the
> MSRP can only be seen as **a manifestation of FWS's intention** finally to revise the
> critical habitat designation to help save this bird from its near-certain demise.
> Accordingly, the Court finds that FWS had a duty to revise the Cape Sable seaside
> sparrow's critical habitat designation beginning in 1999 with the issuance of the MSRP,
> making the length of the Service's current delay approximately four years.

*Id.* at 14 (emphasis added). The court recognized that contents of the Recovery Plan committed

the agency to act in some manner and the agency had a duty to follow through with its findings.

Clearly the MSRP had real world consequences prompting other further action by FWS.

In *Center for Biological Diversity v. Evans*, another federal court reviewed the content of

the Final Recovery Plan for Northern Right Whale in determining whether the agency was

required to designate critical habitat for the species in the Pacific Ocean. Civ. No. 04-04496

WHA, 2005 U.S. Dist. LEXIS 44984 (N.D. Cal. June 14, 2005). NMFS had already designated

critical habitat for the right whales in the Atlantic, but—in conflict with its instruction in the

1991 Recovery Plan— had declined to designate any in the Pacific. *Id.* at *4.

The Recovery Plan "called for the identification and protection by 1996 of "critical

habitat(s)—habitats essential to the survival and recovery of the right whales in the Pacific

Ocean." *Id.* *4. At its initial publication, the Plan "could not yet determine what habitat areas

were critical to the survival of the right whales in the Pacific," but recommended that "once the

areas essential to the survival and recovery were identified [], those areas should be protected

under the Act." *Id.* The court relied on the five-year designation identified in the Recovery Plan

in determining NMFS failure to designate "not only amounted to unreasonable delay but was 'arbitrary [and] capricious" under APA §706. *Id*. at *15-60; *20.

Courts have also discussed the significance of the "objective, measurable criteria" in a recovery plan for delisting the species. In a challenge to the sufficiency of the grizzly bear recovery plan, the court noted that the Act, "does not detail specific methods or procedures that are necessary to achieve conservation," but concluded that the agency's "flexibility …to recommend a wide range of 'management action,'" it is not unlimited. *Fund for Animals*, 903 F. Supp. at 106. The court outlined the limitation on agency discretion, stating "[a] recovery plan that recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard." *Id.* at 108.  The *Fund for Animals* court discussed the discernible relationship between the "objective measurable criteria" requirement and delisting factors, noting that the agency "in designing objective, measurable criteria, must address each of the five statutory delisting factors and measure whether threats to the species have been ameliorated." *Id.* at 111.

In *Defenders of Wildlife v. Babbitt* the court employed a similar analytical approach in examining the provisions of a recovery plan. 130 F. Supp. 2d 121 (D.D.C. 2001). In *Defenders*, the court relied on the standards delineated in *Funds for Animals v. Babbitt* in assessing the sufficiency of the Biological Assessment, BiOp and Recovery Plan for the Sonoran pronghorn. *Id.* The court relying on *Fund for Animals*, stated "to the maximum extent practicable' does not permit an agency unbridled discretion." *Id.* at 131. The court concluded that the agency failed to provide sufficient explanation for its decision not to include delisting criteria or more definite time estimates for recovery and had "acted in a manner that is arbitrary and capricious… in

issuing a Recovery Plan that failed to establish objective measurable criteria." *Id* at 132-144; 140.

Courts have explicitly ruled an agency's action "arbitrary and capricious" for the unexplained deviation from the recovery criteria, despite its non-binding nature. The District of Montana court reviewed the Service's recovery plan for gray wolves upon the species delisting. *Defenders of Wildlife v. Hall,* 565 F.Supp.2d 1160, (D. Mont. 2008). The court discussed the recovery goals that stressed the need for genetic interchange among three subpopulations to achieve a "high probability of long-term persistence." *Id.* at 1168-72. The court addressed the adherence to and importance of the initial criteria within a recovery plan:

> Although the Service's recovery criteria are not binding, the Service must provide adequate reasons for rejecting those criteria. Here, the Service continues to stand behind one component of the recovery criteria-30 breeding pairs and 300 wolves--but rejects another component--genetic exchange--as unnecessary. In doing so, the Service provides no new evidence or research that did not exist when the recovery criteria were established. The Service cannot change course without reason.

*Id.* at 1171. Based on the agency's departure from the Recovery Plan, the *Hall* court held that the agency's decision was arbitrary and capricious because it failed to provide "reasoned analysis" for its decision to alter the recovery criteria. *Hall*, 565 F.Supp.2d at 1170.

These cases demonstrate that recovery plans have direct consequences on other federal agencies.  The fact that a specific term in a specific plan was unenforceable as a delisting requirement in *Blackwater* does not turn recovery plans into empty gestures, with their contents beyond judicial review, and subject to political manipulation.  The above-cases prove otherwise. The Supreme Court has found "the mere possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal." *Sackett,* at 566 U.S. at 127.  Thus the fact part of a recovery plan may be reconsidered, or even not followed at a later date does not

mean the final plan is exempt from APA jurisdiction. Nor is an "agency's refusal to describe an action as final [] dispositive of reviewability." *Defenders of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1112-13 (D. Ariz. 2009) (quoting *Her Majesty the Queen ex re. Ontario v. EPA*, 286 U.S. App. D.C. 171, 912 F.2d 1525, 1531 (D.C. Cir. 1990)).  Given the presumption of reviewability under the APA, and the numerous courts that use the recovery plan in assessing delisting decisions, dismissing the Bull Trout Recovery Plan as non-justiciable is an error of law that must be corrected by this Court.

3. <u>The primary case cited in the F&R for its conclusion regarding APA jurisdiction is not analogous to ESA Recovery Plans.</u>

The F&R points to *Stout v. U.S. Forest Service* as the standard for whether a management plan should be considered final agency action. Civil No. 09-152-HA, 1022 WL867775, at *6 (D. Or. March 10, 2011) (citing *Ohio Forestry Ass'n, Inc. vs. Sierra Club,* 523 U.S. 726, 729-20 (1998). The case is simply not analogous.  *Stout* does not address ESA recovery plans.  Unlike the present case, *Stout* deals with the intersection of Section 7 Consultation duties under the ESA and the inclusion of a management plan under the Wild Horses Act. 16 U.S.C. § 1331. The Court in *Stout* used the *Bennett* test to determine whether the 2007 Wild Horse Plan was a final agency action. The 2007 Wild Horse Plan set "standards for managing wild horses… and dictate[d] the provisions and guidelines that Forest Service must follow." *Stout*, at 24.  Thus the Wild Horse Plan was an action that required consultation.

In *Stout*, the court concluded that the "adoption and implementation of management plans with area-specific standards and guidelines that could be place for several years is considered an agency action under the ESA." *Id* at 24 (citing *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th  Cir. 1994)). Moreover, because the plan "may affect listed species [under the ESA]

PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S FINDINGS & RECOMMENDATION-14

because it sets forth criteria for managing wild horses" within steelhead critical habitat, the Service was required to consult with NMFS under Section 7. *Id* at 24-25.

The Wild Horse Plan case provides general guidance on what constitutes a final agency action. Similar to the 2007 Wild Horse Plan, a Recovery Plan should include area-specific standards, particularly in the requirements for objective, measureable recovery criteria, which provide guidelines, schedules and measures for the Service to implement.  While the Service is entitled to discretion in the substance and means in which they reach their conclusions, the legal consequences of delisting a species stem from the objective, measurable criteria the Service lays out in the Recovery Plan, or the Service's careful explanation of why it chooses to deviate from them.. These measurable, objective criteria include area-specific standards and guidelines that not only amount to the Service's position on bull trout recovery as a whole, but also serve as a legal marker relied upon by the agency in the Bull Trout's eventual delisting.

In sum, the fact that the Wild Horse Plan was a final action in *Stout* for the narrow purpose of triggering a Section 7 consultation for the Forest Service does not mean that a recovery plan under Section 4 is not a final agency action.

4.    The ESA does not preclude judicial review nor is a Recovery Plan committed to agency discretion by law.

The APA provides judicial review of the substance of "final agency actions" unless they are "committed to discretion by law." 5 U.S.C. §701. The bar to invoke this jurisdictional exception is quite high; Congress must provide a clear indication that the agency carrying out the statutory mandate is exempt from review. The legislative history of the APA "indicates that it is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410,

91 S. Ct. 814, 28 L. Ed. 2d 136 (1971), (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).

Congress must make a "showing of 'clear and convincing evidence' of a * * * legislative intent' to restrict access to judicial review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1970) (*quoting Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, (1967)). *See also Brownell v. We Shung*, 352 U.S. 180, 185 (1956). The Service has not produced clear Congressional intent to preclude judicial review of Section 4 ESA actions nor is there any explicit language in the Act precluding such review.

The F&R concedes the "express purpose of the Act, and the requirement that certain information be incorporated" *may* provide the "requisite meaningful standard to review the Secretary's exercise of discretion." F&R 24. However, the F&R does not reach a conclusion on this matter. *Id.* The specific, enumerated substantive requirements for a recovery plan, coupled with lack of evidence that Congress has sought to preclude judicial review, repudiate any argument that any part of the Act, let alone the recovery plan provisions, are "committed to agency discretion by law."

### B.  The Practical Consequences of Shielding Recovery Plans From Judicial Review Renders Statutory Requirements for Public Comment Meaningless.

1.  <u>To eliminate judicial review of recovery plans contravenes Congressional intent and purposes of the Act.</u>

The enactment of the ESA was a bold declaration by Congress that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531 (a)(1). The Ninth Circuit explains that "the ESA was enacted not merely to forestall the extinction of species… but to allow a species to recover to the point where it may be

delisted…[I]t is clear that Congress intended that conservation and survival be two different (though complementary) goals of the ESA." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1070 (9th Cir. 2004). The term "conservation" is defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. ¶ 1532 (3). Recovery plans are the tool to achieve the conservation of a species. Congress not only intended that the agency create a Recovery Plan, in an effort to reach the Act's ultimate goal of delisting, but went as far as to specifically mandate the substance and criteria that should be included. To put the substantive requirements 100% out of the purview of judicial review frustrates the entire purpose and structure of the ESA.

Without a viable recovery plan, the goals of the Endangered Species Act would likely never be met. Recovery is not an isolated action of the Service, but rather a continuum of discrete steps laid out in Section 4 to protect and recovery species. Beginning with the listing process, critical habitat designation, recovery plan implementation and eventual delisting, all are necessary in achieving the goal of recovery. The impact of the Magistrate's F&R is to render Section 4(f) nearly a dead letter. Under the Magistrate's ruling, a recovery plan must only contain mention of the statutory criteria. The substance of the plan could be based on century old discredited science, completely ignore the input of state wildlife agencies and the public, and ultimately contain requirements that have nothing to do with species' recovery. For bull trout, it means the Service is free to ignore the impact of climate change (warm water and low stream flows). It means that the voluminous scientific comment opposing this The Magistrate's decision, if adopted, is placing the whole of the Section 4 scheme into uncharted waters.

2.      The Magistrate's Determination that the Recovery Plan is not subject to judicial
review eviscerates Congressional purpose behind public comment.

Under Section 4 of the Act, the Service "shall, prior to final approval of a new or revised

recovery plan, provide notice and an opportunity for public review and comment." 16 U.S.C.

§1533(f)(4). The Service submitted the Bull Trout Recovery Plan for public comment and under

the Act "shall, prior to implementation of [the] new or revised recovery plan, consider all

information presented during the public comment period." 16 U.S.C. §1533(f)(5). Through this

section Congress granted the public a right to comment on the draft plan and placed an obligation

on the Service to address those comments.

Public participation in general, is an important process in agency decision-making. These

requirements are "intended to alert the [agency] to potential problems with the draft" and to

"ensure that it has an opportunity to address those problems before [it] becomes final." *Adams v.*

*U.S.* , 38 F. 3d 43, 51 (1st Cir. 1994) (discussing CWA public participation regulations in NPDES

permitting process). Congress sought to invite, rather than suppress the public's scrutiny of

agency action, with the understanding that §§1533(f)(4), (5) "would do more than pay lip service

to public participation; instead 'the public must have a genuine opportunity to speak on the issue

[.]" *Id.* at 52 (citing *Natural Resources Defense Council, Inc. v. USEPA*, 859 F.2d 165, 177 (D.C.

Cir. 1988) (construing public participation regulations in state enforcement process).

Courts recognize that "there is a considerable public interest in assuring governmental

accountability." *Alliance for the Wild Rockies v. Department of Interior*, 53 F. Supp. 2d 32, 37

(D.D.C. 1999). Public oversight of agency action "serves a critical public function by protecting

against agency overreaching and abuse of discretion." *Id.* If this Court grants the Motion to

Dismiss, there will be no way to hold the government accountable for incorporating and

considering the public's concerns regarding the Bull Trout Recovery Plan.

PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S FINDINGS & RECOMMENDATION-18

The statute's language reinforces that Congress contemplated some significant level of judicial review, at the very least, through APA §706 review. The use of "shall" is plainly that of obligation rather than discretion and shows Congress explicitly sought to ensure meaningful public participation in the process of developing Recovery Plans. Without reviewing the administrative record, the intended public oversight is abolished.

It seems unlikely for Congress to have mandated public involvement in two subsections of the Section 4, yet also intended that there be no meaningful judicial review of how the Service approached its duties. Barring judicial review of a Recovery Plan would render §1533(f)'s public participation requirements inconsequential. Congress would not have made public comment mandatory and then permit the agency to ignore it.

### C. The Statutory Requirement to Develop and Implement a Recovery Plan is a Nondiscretionary Duty that is Subject to ESA Citizen Suit Provisions.

Plaintiffs alternatively pled both APA and the ESA for jurisdictional purposes. As the F&R notes, few courts have considered the degree of discretion afforded to agencies under the Act in regards to the content of a Recovery Plan. F&R at 7. The cases the F&R relies on are inconclusive on the issue before the court.  Section 11 of the ESA is a critical and the most democratic section of the statute, as it allows citizen participation in the conservation of threatened or endangered species. Section 11 broadly permits "any person may commence a civil suit on his own behalf…against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 4 which is not discretionary." 16 U.S.C. § 1540(g)(1); *Bennett v. Spear*, 520 U.S. at 164-65.  If the Court finds that the Recovery Plan is not final agency action under the APA, citizen jurisdiction arises under ESA Section 11.

The F&R points to *Kennecott*, a Clean Air Act case, where the court distinguished between the Administrator's "obligation to act and the process or decisions to be made prior to

fulfilling such obligation." F&R at 9.  Relying on *Kennecott Copper v. Costle,* 472 F.2d 549 (9th Cir. 1975), the Magistrate found citizen-suit provision "does not create a cause of action to challenge the substance of a recovery plan" and therefore the court did not have jurisdiction to review the general claim. *Id.*  However the statutory language in the ESA differs from the Clean Air Act provisions at issue in *Kennecott.*

The F&R also address the *Bennett* decision in some detail. F&R at 10-12.  Plaintiffs agree that *Bennett* is an important marker for this case.  As discussed above, and not addressed by the Magistrate, is the Supreme Court's determination that APA jurisdiction arose where ESA jurisdiction did not.

Finally, the F&R cites to the *Center for Biological Diversity v. Bureau of Land Management*, in which the court stated the "shall" language applies only to the Secretary decision to issue a Recovery Plan or determine a Recovery Plan will not promote the conservation of the species, it does not permit discretion to do neither." 35 F. Supp. 3d 1137, 1151 (N. D. Ca. 2014). The court did not consider whether the contents of the plan were discretionary or if there was jurisdiction to review the Plan under the Act's citizen-suit provision. F&R at 12. The case thus has no bearing on the instant circumstances.

Furthermore, the cases relied upon in the F & R do not address Section 4's mandatory duty for public participation.  As discussed above, the ESA requires that the Secretary "shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such a plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan." §1533(f)(4). Thus the Service has a non-discretionary duty to consider all information presented during the public comment period. The ability of citizens to sue the Service for failure to

consider all information presented during the public comment period, clearly a non-discretionary duty, would be foreclosed under the magistrate's recommendation here. This provision also clearly reinforces that Congress intended some level of meaningful judicial review of the substance of recovery plans. It would be nonsensical for Congress to require the Service to consider all information from the public comment period, then provide no judicial oversight to ensure that all the information has actually been considered.

Judicial oversight to ensure that information from the public comment period has been considered by the Service requires filing an administrative record with full public comment and the agency's response. By recommending a dismissal —— and thus precluding this Court's review of the administrative record — the F&R would prevent this Court from ever considering whether the Service has complied with its non-discretionary duty to consider all information from the public comment period.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court must reject the Findings and Recommendation of the Magistrate, deny the Service's Motion to Dismiss and allow this matter to proceed to a decision on the merits of the claims.

Dated February 13, 2016.

/s/ Jack R. Tuholske_____
Jack R. Tuholske (Montana Bar # 2902)
TUHOLSKE LAW OFFICE, P.C.
1149 Harrison St.
P.O. Box 7458
Missoula, MT 59807
Telephone: (406) 396-6415
jtuholske@gmail.com

[Signatures Continued on Next Page]

PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S FINDINGS & RECOMMENDATION-21

_/s/ Timothy Bechtold_
Timothy Bechtold (Montana Bar #4376)
Bechtold Law Firm, PLLC
317 E. Spruce Street
PO Box 7051
Missoula MT 59807
Telephone (406) 721-1435
tim@bechtoldlaw.net


_/s/ Peggy Hennessy_
Peggy Hennessy (Oregon Bar #872505)
Gary K. Kahn (Oregon State Bar #814810)
Reeves, Kahn, Hennessy & Elkins
4035 S.E. 52nd Avenue
P.O. Box 86100
Portland, OR 97286-0100
Telephone:  (503) 777-5473
phennessy@rke-law.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

hereby certify that on February 13, 2017, I electronically filed the foregoing Plaintiffs' Objections to Magistrate's Findings & Recommendations with the Court's electronic filing system, which will generate automatic service upon all Parties enrolled to receive such notice.

*s/ Peggy Hennessy*  _____
Peggy Hennessy (Oregon Bar #872505)
Gary K. Kahn (Oregon State Bar #814810)
Reeves, Kahn, Hennessy & Elkins

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 6,679 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel. Pursuant to LR 7-1(c), no table of contents or table of authorities is required for this brief.

*s/ Peggy Hennessy*  _____
Peggy Hennessy (Oregon Bar #872505)
Gary K. Kahn (Oregon State Bar #814810)
Reeves, Kahn, Hennessy & Elkins

Certificate of Service/Compliance